# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROSSISA PARTICIPAÇÕES S.A. and CIA. ROSSI DE AUTOMÓVEIS, | : : : | Case No. 3:18-cv-00297 |
| Petitioners, | : : | Judge Thomas M. Rose |
| v. | : : | |
| THE REYNOLDS AND REYNOLDS COMPANY, | : : : | |
| Respondent. | : | |

_____

## ENTRY AND ORDER DENYING PETITION TO CONFIRM ARBITRATION AWARD (DOC. 1) AND TERMINATING THE CASE
_____

This case is before the Court on the Petition to Confirm Arbitration Award and to Enter Judgment (Doc. 1) (the "Petition") filed by Petitioners ROSSISA PARTICIPAÇÕES S.A. and CIA. ROSSI DE AUTOMÓVEIS (collectively "Rossi" or "Petitioners"), pursuant to 9 U.S.C. §§ 207, 302, and 304. Specifically, Petitioners ask this Court to confirm and recognize an arbitration award dated July 3, 2017 that an arbitrator issued in Brazil (the "Award") and to enter a judgment in their favor against the Respondent THE REYNOLDS AND REYNOLDS COMPANY ("Reynolds" or "Respondent") in the amount of the Award—plus specified interest, statutory adjustments, costs, and attorneys' fees.[1] (Doc. 1.) Reynolds responded to the Petition by filing a "Motion to Dismiss, and Opposition to, Petition for Confirmation of the Arbitration Award" (Doc. 9) (the "Response"). In the Response, Reynolds asks that the Court dismiss or deny the Petition and refuse recognition and enforcement of the Award. The Petitioners then filed a Reply in support of their Petition (Doc. 19) (the "Reply"), and Reynolds filed a Sur-reply in support of the Response

_____

[1] Petitioners attached to the Petition Portuguese and English versions of the Award. (Docs. 1-3 and 1-13.)

(Doc. 22) (the "Sur-reply"). The Petition is fully briefed and ripe for review. (Docs. 1, 9, 19, 22.) For the reasons discussed below, the Court **DENIES** the Petition and **TERMINATES** this case.

## I.    BACKGROUND

Petitioners are Brazilian corporations whose offices are located in Brazil. At the time of the relevant events, they were primarily involved in the business of distributing Volkswagon vehicles in Brazil. Reynolds is an Ohio corporation headquartered in Dayton, Ohio that was incorporated in 1889. Reynolds develops and supports proprietary software used by automotive retailers to manage sales logistics at dealerships. Reynolds also manufactures and distributes business forms and promotional items for the automobile industry.

### A.  The Contracts and Arbitration

In 1997, Petitioners purchased an electronic system for data processing. They made the purchase through signing three contracts with three different entities: Universal Computer Software, Ltd. ("Software Bermuda"), a Bermudan corporation; Universal Computer Systems, Ltd. ("Systems Bermuda"), a Bermudan corporation; and Universal Computer Services, Ltda. ("UCS Brazil"), a Brazilian corporation.[2] The three contracts each contain arbitration clauses, which call for arbitration of claims and disputes "between the parties to" the contracts.[3]

The electronic system that Petitioners had purchased allegedly did not work as promised. Petitioners therefore sought an arbitration per the terms of the three contracts. On January 30, 2007, Petitioners filed with a Brazilian court a request to appoint an arbitrator to hear the dispute

---

[2] Petitioners attached to the Petition copies of the three contracts. (Docs. 1-8, 1-9, and 1-10.)

[3] For example, the contract with UCS Brazil states, in part: "SECTION 13. DISPUTE RESOLUTION … Except as provided otherwise in this Agreement, all claims, disputes, controversies and other matters in question between the parties to this Agreement, arising out of or relating to the Agreement, or to the breach thereof … and which cannot be resolved by the parties, shall be settled by arbitration in accordance with the Arbitration Procedure described below. … A. Either party may demand arbitration by providing the other party written notice of such demand. A matter will then be deemed submitted to arbitration. B. All such matters shall be submitted to arbitration in San Paulo, Brazil to be arbitrated by a person agreed upon by the parties to the dispute. If the parties cannot agree on an arbitrator … the arbitrator shall be chosen by the competent judge." (Doc. 1-8 at PAGEID # 84, 96-97.)

and commence an arbitration against Software Bermuda, Systems Bermuda, UCS Brazil, as well two American entities: Universal Computer Services, Inc. and Universal Computer Systems, Inc. (*See* Doc. 1-8 at PAGEID # 96-97 (arbitration provision stating that, if the parties cannot agree on an arbitrator, then the arbitrator shall be chosen by a judge); Doc. 1-16.) On December 9, 2014, a Brazilian judge issued a "Decision" that appointed an arbitrator and identified the parties to the arbitration as those in the January 30, 2007 request. (Doc. 1-17.) On April 28, 2015, the Brazilian judge issued another "Decision" that substituted Reynolds for the five entities identified as parties to the arbitration in the January 30, 2007 request and December 9, 2014 Decision (besides Petitioners). (Doc. 1-17 at PAGEID # 235.) According to the Petitioners, they "requested the Brazilian Court to substitute the name of Reynolds" as a party in the arbitration on the basis of two filings with the United States Securities and Exchange Commission ("SEC"): an August 8, 2006 DEFA14A and an October 26, 2016 8-K. (Doc. 19 at PAGEID # 360.[4])

The arbitration proceeded in Brazil, and Petitioners received the Award. The Award states that Reynolds was "regularly served notice" of the arbitration; however, Reynolds did not attend the proceedings and did not answer the allegations. (Doc. 1-13.) After Petitioners presented evidence and their case, the arbitrator found Reynolds "liable for the defects found in the system." (*Id.*) The arbitrator awarded damages, as well as certain costs, fees, and expenses. (*Id.*)

Reynolds admits that, in or around 2013, it received notice of a lawsuit against Reynolds that Petitioners had filed in a Brazilian court. However, Reynolds defends its decision to decline to appear in that lawsuit by arguing that it was not subject to jurisdiction in Brazil, had never entered into any contract with Petitioners, and was otherwise not a party, successor, or assign of

---

[4] *See also* Doc. 19-1 (Declaration No. 2 of Gustavo Leite (Brazilian counsel for Petitioners)), at ¶¶ 6-7 (stating that he "relied upon Reynolds' SEC filings [one dated August 8, 2006 and one dated October 26, 2006], noting its merger with Universal Computer System, Inc., in seeking an order for Reynolds to arbitrate in Brazil").

any contract between Petitioners and UCS Brazil, Software Bermuda, or Systems Bermuda. Reynolds also admits that, in or around 2015, it received a demand for arbitration from the Brazilian arbitration authority. However, it similarly defends its decision not to respond to the demand by arguing that it was not subject to jurisdiction in Brazil, had never entered into any contract with Petitioners, never agreed to arbitrate any dispute with Petitioners, and was otherwise not a party, successor, or assign of any contract between Petitioners and UCS Brazil, Software Bermuda, or Systems Bermuda.

## B. **The Various Entities**

It is undisputed that Reynolds did not sign any of the three contracts involved in Petitioners' purchase of the electronic system. It is those three contracts that contain the arbitration agreements that led to the arbitration and the Award. The crux of Petitioners' position is that they purchased the electronic system "in 1997 from predecessors of Reynolds," "[t]he predecessors consisted of an entity known as Universal Computer Services, Inc. ("UCS") and its affiliates," and "Reynolds merged with UCS as of October 2006." (Doc. 1 at PAGEID # 2.)

However, Reynolds (an entity in existence since 1889) argues that it was never affiliated with the three foreign entities that signed the three contracts (i.e., Software Bermuda, Systems Bermuda, and UCS Brazil), nor has it acquired any of those entities' assets, shares, or liabilities. (Doc. 9 at PAGEID # 259.) Reynolds also asserts that "the only 'connection' between Reynolds and any of [the three foreign entities] is that Reynolds was acquired in 2006 by an American company called Dealer Computer Services, Inc. ("DCS"), a company which had previously merged with another American company called Universal Computer Services, Inc. ([again] "UCS"), which had, at one point, owned the Brazilian company that contracted with [Petitioners] in the 1990s," i.e., UCS Brazil. (*Id*.)

In support of its Response, Reynolds filed the Declaration of Sheri Robinson, Vice

President, Accounting, at Reynolds ("Robinson Decl."). (Doc. 9-1.) In her declaration, among other things, Ms. Robinson states that:

- Reynolds currently does not do business in Brazil, nor to the best of [her] knowledge has it ever done business in Brazil.

- Reynolds has never entered into any contract with [Petitioners] and has never had any business dealings with [Petitioners].

- Reynolds also has never acquired, merged with, or otherwise succeeded to the liability of Software Bermuda, Systems Bermuda, or UCS Brazil.

- UCS and DCS merged in 2001 with DCS as the surviving entity post-merger.[5]

- UCS Brazil was owned 99% by UCS.[6]

- DCS acquired Reynolds in October of 2006. DCS established a new entity to effectuate the acquisition, Racecar Acquisition Co. ("Racecar"), which then merged with and into Reynolds. At that time, Reynolds become a wholly-owned subsidiary of DCS.[7]

- After DCS's acquisition of Reynolds in 2006, Reynolds became a wholly-owned subsidiary of DCS, but the companies continued to exist as separate and distinct entities.

- Reynolds and DCS remain separate and distinct corporate entities.

(Robinson Decl. (Doc. 9-1) at ¶¶ 5, 10-13, 17-18.)

Citing the proxy statement that it filed with the SEC regarding its merger with Racecar, Reynolds states that DCS is a wholly-owned subsidiary of Universal Computer Systems Holding, Inc. ("UCS Holding"). (Doc. 22 at PAGEID # 651.) Per the Robinson Declaration, UCS Holding was an affiliate of UCS that created DCS to be the ultimate acquiring entity of UCS, so that when UCS and DCS merged in 2001, DCS was the surviving entity post-merger. (Doc. 9-1 at ¶¶ 6, 8,

---

[5] Ms. Robinson attached to her Declaration the publicly-filed certificate of merger between UCS and DCS. (Doc. 9-2.)

[6] Although Reynolds therefore admits that UCS Brazil was affiliated with UCS, it provides no such admission with respect to Software Bermuda or Systems Bermuda—the other two entities that signed contracts with Petitioners.

[7] Ms. Robinson attached to her Declaration the publicly-filed Articles of Incorporation of Racecar Acquisition Co. and Certificate of Merger between Racecar and Reynolds. (Doc. 9-3.)

10.)

As explained by Reynolds in its briefing (and shown in the proxy statement and the Certificate of Merger between Racecar and Reynolds), the transaction in which DCS acquired Reynolds in 2006 was a relatively complicated, strategic transaction commonly known as a "reverse triangular merger." *See Medpartners, Inc. v. Calfee*, 140 Ohio App. 3d 612, 748 N.E.2d 604, 613 (Ohio Ct. App. 2000) (describing a "reverse triangular merger," where company one acquired company two by forming a wholly owned subsidiary, which was then merged with and into company two—resulting in company two being the surviving corporation and a wholly-owned subsidiary of company one); *Binder v. Bristol-Myers Squibb, Co.*, 184 F. Supp. 2d 762, 772 ("The advantage of [a reverse triangular merger] is that [the target company] will become a wholly-owned subsidiary of [the acquiring company] without any change in its corporate existence. Thus, the rights and obligations of [the target company] are not transferred, assumed or affected."). Reynolds states that, as a result of the transaction, both DCS and Reynolds still exist today as separate corporate entities, with Reynolds as a wholly-owned subsidiary of DCS. (Doc. 9 at PAGEID # 262-63.)

### C. **The SEC Filings**

To further support its assertion that it did not merge with UCS or succeed to the liability of the three entities that contracted with Petitioners, Reynolds submitted to the Court its Schedule 14A (Proxy Statement) that it filed with the SEC concerning the transaction. (Doc. 22-1.) The Proxy Statement states, among other things, the following:

Q. What is the proposed transaction?

A. The proposed transaction is a merger whereby an indirect, wholly owned subsidiary of [UCS Holding] will be merged with and into Reynolds. As a result of the merger, Reynolds will become a wholly owned subsidiary of [UCS Holding], and Reynolds common shares will cease to be listed on the New York Stock Exchange, will not be publicly traded and will be deregistered under the Exchange

Act.

…

> ***Structure of the Merger*** … Upon the terms and subject to the conditions of the merger agreement, [Racecar], a subsidiary of [UCS Holding], will be merged with and into Reynolds.  As a result of the merger, [Reynolds] will become a wholly owned subsidiary of [UCS Holding].

(*Id*. at PAGEID # 675, 682.)

As referenced above, the <u>Petitioners</u> rely on two other SEC filings to support their contrary assertion that the transaction was a merger between Reynolds and UCS.  The first such filing is an August 8, 2006 DEFA14A that is actually a copy of an email from Reynolds' then-CEO to "All Reynolds associates."  (Doc. 19-4.)  It was created prior to the transaction being finalized or approved, and it states, among other things, the following:

> August 8, 2006
>
> CEO O'Neill e-mail
>
> To:  All Reynolds associates
>
> Today Reynolds and Reynolds announced that it will merge with Universal Computer Systems to create the world's pre-eminent dealer services provider.  The new company will be known as the Reynolds and Reynolds Company, headquartered at the current Reynolds Headquarters campus.  … By combining the companies as Reynolds and Reynolds, we will offer customers the benefits of UCS's advanced products, complemented by our own products, reputation and reach in the market, and by our unrelenting focus on customer satisfaction.
>
> …
>
> In the midst of the excitement about what this means for Reynolds – and anticipation about how the two companies will be combined – it's important to remember that the transaction needs regulatory clearance and shareholder approval, which currently we expect before the end of the calendar year.
>
> Until the transaction closes, how you did your job yesterday is how you should do your job tomorrow.
>
> …

(*Id*. at PAGEID # 450.)

The second SEC filing relied on by Petitioners is an October 26, 2016 8-K that is actually a copy of a press release. (Docs. 1-6, 19-3.) The press release states, among other things, the following:

> REYNOLDS AND REYNOLDS ANNOUNCES CLOSING OF MERGER WITH UNIVERSAL COMPUTER SYSTEMS
>
> DAYTON, OHIO, OCTOBER 26, 2006 – The Reynolds and Reynolds Company (NYSE: REY) today announced that its merger with Universal Computer Systems Inc. has closed.
>
> Reynolds shares will be de-listed from the New York Stock Exchange effective with the opening of business on October 27, 2006.
>
> …
>
> As announced on August 8, 2006, under the terms of the agreement with UCS, holders of Reynolds Class A common stock will receive $40 per share in cash. The transaction is valued at approximately $2.8 billion, including the assumption of Reynolds' debt. Reynolds shareholders will receive a letter of transmittal with instructions advising them on how to send in their share certificates.
>
> The combined company will continue to be named The Reynolds and Reynolds Company, with the products and services of both Reynolds and UCS marketed under the Reynolds brand. Reynolds will continue to have headquarters and principal operations in Dayton, Ohio.

(*Id*. at PAGEID # 446-47.)

## II.    LEGAL STANDARD

The United States and Brazil are both signatories to The Inter-American Convention on International Commercial Arbitration ("Inter-American Convention"). *See* 14 I.L.M. 336 (1975); 9 U.S.C. § 301, historical notes. Chapter 3 of Title 9 of the United States Code (9 U.S.C. § 301 *et seq.*) codifies the Inter-American Convention, which "applies when an arbitration arises from a commercial relationship between citizens of signatory nations." *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 275 F. Supp. 2d 681, 684-85 (S.D.N.Y. 2003), *aff'd* 344 F.3d 255 (2d Cir. 2003). The Inter-American Convention incorporates certain provisions of the Convention on

the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") and the Federal Arbitration Act ("FAA"), unless such provisions are in conflict with the Inter-American Convention. *See* 9 U.S.C. §§ 302, 307; *Banco de Seguros*, 257 F. Supp. 2d at 684-85. The New York Convention (21 U.S.T. 2517 (1970)) is codified at 9 U.S.C. § 201 *et seq.*, and the FAA is codified at 9 U.S.C. § 1 *et seq.*

One of the provisions from the New York Convention that is incorporated into the Inter-American Convention is 9 U.S.C. § 207, which states:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall affirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

*See* 9 U.S.C. § 302 (applying 9 U.S.C. § 207 to 9 U.S.C. § 301 *et seq.*). The "grounds for refusal or deferral of recognition or enforcement" of such an arbitration award are found at Article V of both the New York Convention and the Inter-American Convention.[8] Among the seven specified grounds for refusing to recognize and enforce an arbitration award are the following:

> The recognition and execution of an arbitral decision may also be refused if the competent authority of the State in which the recognition and execution is requested [i.e., this Court] finds:
>
> a. That the subject of the dispute cannot be settled by arbitration under the law of that State [i.e., the United States]; or
>
> b. That the recognition or execution of the decision would be contrary to the public policy of that State [i.e., the United States].

Inter-American Convention at Art. V(2); *see also* New York Convention at Art. V(2).

United States federal policy favors arbitral dispute resolution, and that policy "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-*

---

[8] The language in Article V of both the Inter-American Convention and the New York Convention is substantially similar.

*Plymouth*, 473 U.S. 614, 631 (1985). There is a "presumption that foreign arbitration awards will be confirmed," as shown in 9 U.S.C. § 207 quoted above. *Aasma v. Am. S.S. Owners Mut. Prot. & Indem.*, 238 F. Supp. 2d 918, 920 (N.D. Ohio 2003), *aff'd* 96 F. App'x 995 (6th Cir. 2004) (*per curiam*). However, "the defenses to enforcement of awards described in the New York Convention … remain available to parties who are unsuccessful in arbitration proceedings." *M & C Corp. v. Erwin Behr GMBH & Co., KG*, 87 F.3d 844, 847 (6th Cir. 1996). The party opposing confirmation of a foreign arbitration award bears the burden of demonstrating one of the grounds for refusing to enforce the arbitration award. *Aasma*, 238 F. Supp. 2d at 921.

## III. <u>ANALYSIS</u>

### A. <u>Subject Matter Jurisdiction</u>

As an initial matter, this Court verifies that it has subject matter jurisdiction to consider the Petition and Reynolds' opposition to confirmation of the Award. The Sixth Circuit has found that 9 U.S.C. § 207 "clearly bestows upon the district court the authority to entertain" a motion to confirm a foreign arbitration award that falls within the New York Convention or Inter-American Convention. *M & C Corp.*, 87 F.3d at 848; *see also* 9 U.S.C. §§ 203, 301, 302. "Similarly, because that same statutory provision and Article V of the New York Convention [as well as Article V of the Inter-American Convention] also recognize a party's right to object to confirmation on specified grounds," a challenge to a foreign arbitration award that falls within the New York Convention or Inter-American Convention, "on such limited bases, is also within the jurisdiction of the district court." *Id.*; *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 659-60 (2d Cir. 2005) (United States district court had subject matter jurisdiction under 28 U.S.C. §1331 to decide petition to confirm foreign arbitration award against company that was a nonsignatory to the arbitration agreement).

**B. Grounds to Refuse Enforcement of Award Under the Inter-American Convention**

It is undisputed that the Award and underlying contracts that contain the arbitration agreements are governed by the Inter-American Convention. Citing Article V(2) of both the Inter-American Convention and the New York Convention, Reynolds argues that recognition and enforcement of the Award should be refused for two independent reasons: (1) the subject matter is not capable of settlement by arbitration; and (ii) the recognition and enforcement of the award would be contrary to public policy. (Doc. 9 at PAGEID # 259.) As referenced above, "recognition and enforcement of an award may be refused if the subject matter of the conflict is not capable of settlement by arbitration in the country in which enforcement is sought, or if recognition and enforcement of the award would violate the public policy of that country." *M & C Corp.*, 87 F.3d at 848; *see also* Inter-American Convention at Art. V(2).

"Arbitration is a matter of consent, not coercion." *Ohio River Valley Assocs., LLC v. PST Servs., Inc.*, No. 3:17-cv-628, 2018 U.S. Dist. LEXIS 19758, at *7 (W.D. Ky. Feb. 7, 2018), *citing EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal quotation marks omitted). The "customary" way in which a party binds itself to arbitrate a dispute with another party is to sign an arbitration agreement (whether a stand-alone agreement or a contract containing an arbitration provision). *Sarhank*, 404 F.3d at 662. This is expressly shown in the Inter-American Convention itself, which states:

> "An agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction is valid. The agreement shall be set forth in an instrument signed by the parties, or in the form of an exchange of letters, telegrams, or telex communications."

Inter-American Convention at Art. I (emphasis added). Where a company is not a party to a contract, then it is not directly subject to that contract's arbitration clause. *Ohio River Valley Assocs.*, 2018 U.S. Dist. LEXIS 19758, at *8. *Accord: Mason v. Mason*, 2017-Ohio-5787, 2017

Ohio App. LEXIS 2853, at ¶17 (Ohio Ct. App. 2017) ("[A]rbitration is a matter of contract and, despite the strong policy in its favor, a party cannot be compelled to arbitrate any dispute that he has not agreed to submit."); *Thompson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("while there is a strong and liberal federal policy favoring arbitration agreements, such agreements must not be so broadly construed as to encompass claims and <u>parties</u> that were not intended by the original contract") (internal citation and quotation marks removed) (emphasis added).

As in *Sarhank*, it is undisputed that the party opposing confirmation of the arbitration award (here, Reynolds) did not sign the contracts that contain the arbitration agreements. *Sarhank*, 404 F.3d at 662. While courts have "recognized instances in which nonsignatories can be bound to the arbitration agreements of others, such cases are limited to instances of incorporation by reference, assumption, veil piercing/alter ego and estoppel and the like," including under "traditional principles of agency law." *Sarhank*, 404 F.3d at 662; *see also Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) ("nonsignatories may be bound to an arbitration agreement under ordinary contract and agency principles").

Therefore, given that Reynolds did not sign an arbitration agreement with Petitioners, the Court must now address whether Reynolds should still be bound—under one of those other "recognized instances"—to Petitioners' arbitration agreements with Software Bermuda, Systems Bermuda, and UCS Brazil. If not, then the Petition must be denied because, under Article V(2)(a) of the Inter-American Convention, the Award would be the product of a "dispute [that] cannot be settled by arbitration under the law of" the State in which the recognition and execution of the Award is requested (here, the United States). Inter-American Convention at Art. V(2)(a); *M & C Corp.*, 87 F.3d at 848; *Sarhank*, 404 F.3d at 662-63; *Ohio River Valley Assocs.*, 2018 U.S. Dist.

LEXIS 19758, at *8; *Mason*, 2017-Ohio-5787, at ¶ 17; *Thompson-CSF*, 64 F.3d at 776; *Exceed Int'l Ltd. v. DSL Corp.*, Civil Action No. H-13-2572, 2014 U.S. Dist. LEXIS 59913, at *35-36 (S.D. Tex. Apr. 30, 2014) (denying application to confirm foreign arbitration award under Article (V)(2) of the New York Convention where the parties did not enter into an agreement to arbitrate their dispute).

### C.  <u>Theories to Bind Nonsignatories to an Arbitration Agreement</u>

"Arbitration agreements apply to nonsignatories only in rare circumstances." *Sapic v. Gov't of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003).  The Sixth Circuit has recognized five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel.  *Javitch*, 315 F.3d at 629, *citing Thompson-CSF*, 64 F.3d at 776.  The Second Circuit in *Sanhank* explained that the instances in which a nonsignatory is bound to the arbitration agreement of another are those where "the totality of the evidence supports an objective intention to agree to arbitrate," under "general principles of contract law."  *Sanhank*, 404 F.3d at 662 ("An American nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law.  To hold otherwise would defeat the ordinary and customary expectations of experienced business persons.") (internal citation omitted).

As shown above, both *Javitch* and *Sanhank* recognize that the analysis involves "ordinary contract and agency principles" and "general principles of contract law."  While the parties do not specifically address whether federal or state law applies, they appear to agree that the state law of Ohio (Reynolds is an Ohio corporation) is applicable here for determinations based on contract and agency principles (*see* Opposition at pp. 11, 14 and Reply at pp. 13-15, 18 (citing Ohio law)). *See also Ohio River Valley Assocs.*, 2018 U.S. Dist. LEXIS 19758, at *9 (finding that "common law contract principles" as interpreted by state courts (there, Kentucky) governed the applicability

of the five theories under *Javitch* for binding nonsignatories to an arbitration agreement). Regardless, the Court has considered all of the law cited in the parties' briefs and finds that the outcome here would be the same whether Ohio state law or federal law applies.

Petitioners argue that Reynolds' claim that the dispute cannot be settled by arbitration because Reynolds is a nonsignatory to the arbitration agreements is unavailing. (Doc. 19 at PAGEID # 367.) They argue that there are independent reasons why Reynolds is bound to the arbitration agreements and, therefore, Reynolds' non-enforcement ground under Article V(2)(a) of the Inter-American Convention fails. Petitioners do not label their reasons as falling under one or more of the theories under *Javitch*. (*See* Doc. 19.) However, Petitioners' reasons do correspond with one or more of the theories. Petitioners generally set forth their reasons in the Reply:

> Even though it is a non-signatory of the arbitration agreements, Reynolds became bound to the agreements due to: [1] the American corporate guarantee of the Brazilian contracts at issue; [2] Reynolds' merger with the company providing the guarantee; [3] Reynolds' filings with the SEC, representations in federal court actions and in other publicity stating that the transaction was a merger; [4] the corporate integration of the merged companies; and [5] a Brazilian Court judgment entered in reliance on the merger.

(Doc. 19 at PAGEID # 357.) The Court will now address Petitioners' supporting arguments and Reynolds' opposition to them.

### (1) **Assumption – Petitioners' arguments concerning mergers, trade names, and the 1997 guarantee by UCS**

"In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Thomson-CSF*, 64 F.3d at 777. However, "the law respects the separate nature of different corporations." *Town & Country Salida, Inc. v. Dealer Computer Servs.*, 521 F. App'x 470, 476 (6th Cir. 2013). *See also Medpartners*, 748 N.E.2d at 607-08 ("The Ohio Supreme Court has held that parent and subsidiary corporations are distinct legal entities" and that "a surviving corporation after a merger remains a

separate and distinct corporation, with its own assets, property and rights"); *Binder*, 184 F. Supp. 2d at 772 (the rights and obligations of the target company in a reverse triangular merger are not transferred, assumed, or affected).

a. Merger law

The Court first addresses Petitioners' argument that Reynolds was bound to arbitrate due to "longstanding corporation law about the effect of a merger." (Doc. 19 at PAGEID # 367-68.) Petitioners rely on Ohio Revised Code ("O.R.C.") §§ 1701.82(A)(3) and (4), which state:

(A) When a merger or consolidation becomes effective, all of the following apply:

…

(3) The surviving or new entity possesses … all obligations belonging to or due to each constituent entity, all of which are vested in the surviving or new entity without further act or deed. …

(4) [T]he surviving or new entity is liable for all the obligations of each constituent entity …. Any claim existing or any action or proceeding pending by or against any constituent entity may be prosecuted to judgment, with right of appeal, as if the merger or consolidation had not taken place, or the surviving or new entity may be substituted in its place.

O.R.C. §§ 1701.82(A)(3), (4).[9]

The main problem with Petitioners' argument is that it puts the cart before the horse. The statute that Petitioner cites only applies for Reynolds to assume obligations of UCS if there, in fact, was a merger between Reynolds and DCS (or UCS).[10] *Id*. However, the facts presented show that Reynolds did not merge with DCS or UCS; instead it merged with Racecar, with the result being that Reynolds became a wholly-owned subsidiary of (the still existing) DCS. (*See* Robinson

---

[9] "Constituent entity" is defined as "any entity merging into or into which is being merged one or more other entities in a merger, or an existing entity being consolidated with one or more other entities into a new entity in a consolidation, whether any of the entities is domestic or foreign." O.R.C. § 1701.01(V).

[10] Again, DCS had previously merged with UCS in 2001, with DCS as the surviving entity, and UCS Brazil had been owned 99% by UCS. However, although not material to this Court's decision, the briefing does not set forth facts connecting Software Bermuda or Systems Bermuda (the other two entities that signed contracts with Petitioners) to UCS.

Decl. (Doc. 9-1) at ¶¶ 10-18; Articles of Incorporation of Racecar Acquisition Co. and Certificate of Merger (Doc. 9-3); Schedule 14A – Proxy Statement (Doc. 22-1).) Thus, Petitioners' argument concerning merger law fails. *See Hospira, Inc. v. Therabel Pharma N.V.*, No. 12 C 8544, 2013 U.S. Dist. LEXIS 102196, at *36-37 (N.D. Ill. July 19, 2013) (nonsignatory did not assume arbitration clause where facts demonstrated that signatory remained an independent legal entity— specifically, a wholly-owned subsidiary—from the nonsignatory); *Binder*, 184 F. Supp. 2d at 772; *Medpartners*, 748 N.E.2d at 616 (surviving corporation of a merger only succeeded to the assets, property, rights, and liabilities of the constituent entities, not of the parent to which it became a wholly-owned subsidiary).

Of course, Petitioners argue that Reynolds should be deemed to have merged with UCS (at least for purposes of the Petition) due to public representations that Reynolds has made. (*See* Doc. 19 at PAGEID # 368.) However, such an argument does not contradict the facts showing that the transaction was a "reverse triangular merger" or change the finding of this Court that Reynolds did not actually merge with DCS or UCS. *See Town & Country Salida*, 521 F. App'x at 473 (district court's decision to vacate arbitration award against party because party did not sign the arbitration agreement was properly based on statements in affidavit that were not contradicted by opposing party). Instead, Petitioners' "deemed to have merged" argument is really an assertion that Reynolds should be estopped from claiming that it did not merge with UCS. The Court addresses that argument later in this Order.

### b. Trade name law

The Court next addresses Petitioners' argument that Reynolds should be bound to the arbitration agreements due to trade name law under Ohio Revised Code § 1329.10(C). That statute states: "An action may be commenced or maintained against the user of a trade name or fictitious name whether or not the name has been registered or reported in compliance with [O.R.C. §

1329.01]." Petitioners assert that "Reynolds used the UCS trade name in explaining that it completed a merger with UCS, thereby creating one, new combined company to serve Reynolds and UCS customers." (Doc. 19 at PAGEID # 368.)

Petitioners' cited caselaw demonstrates the flaws in their argument. O.R.C. § 1329.10(C) operates to allow a plaintiff to proceed against the real defendant in interest when the trade name or fictitious name of that defendant is mistakenly used. For example, Petitioners cite to *Bright v. Family Med. Found., Inc.*, 2006-Ohio-5037, 2006 Ohio App. LEXIS 4947 (Ohio Ct. App. 2006). *Bright* was a medical malpractice case that did not involve an arbitration agreement or assumption of liability. Instead, it involved a motion for relief from a default judgment due to excusable neglect. The defendant argued that a default judgment was void because it was rendered against a non-entity. However, the defendant had used the name of that non-entity as a fictitious name to carry on its business, and the plaintiff mistakenly sued under that name. Therefore, despite the plaintiff mistakenly suing a fictitious name and the judgment being in that name, the court found that the judgment was not void and was enforceable against the defendant pursuant to O.R.C. § 1329.10(C). O.R.C. § 1329.10(C) is inapplicable here.

c. 1997 guarantee by UCS

The Court next addresses Petitioners' argument that a guarantee issued in 1997 by Robert Brockman, on behalf of UCS, binds Reynolds. Petitioners attached to their Reply a one-page letter on UCS letterhead dated July 23, 1997 from Mr. Brockman (then president of UCS) that states, in full:

> In regards to the contract that your organization intends to enter into with our wholly-owned subsidiary, Universal Computer Services, Ltda. [i.e., UCS Brazil], we would like to state the following guarantee.
>
> Universal Computer Services, Inc. [i.e., UCS] (which is the 760 employee company that provides hardware and software support for all of our U.S. dealership customers) guarantees all obligations as according to the terms described in the

contract that you sign with our Brazilian subsidiary, Universal Computer Services, Ltda. [i.e., UCS Brazil], including those services described in the contract such as hardware installation, hardware maintenance, software installation and software support for the current version and all future releases of the software.

(Doc. 19-5 at PAGEID # 451.)

As an initial matter, and as Reynolds points out in its briefing, Petitioners do not explain how an alleged guarantee of only one contract with one entity (i.e., UCS Brazil) can support an arbitration award covering three contracts with three different entities. Regardless, even if the guarantee also included the other two contracts (the ones with Systems Bermuda and Software Bermuda), Petitioners' argument that the guarantee binds Reynolds fails for the same reason that its merger law argument fails: the facts presented show that Reynolds did not actually merge with DCS or UCS; instead it merged with Racecar, with the result being that Reynolds became a wholly-owned subsidiary of (the still existing) DCS. Therefore, Reynolds did not assume the guarantee or the liabilities under that guarantee. *Town & Country Salida*, 521 F. App'x at 476 (6th Cir. 2013) ("the law respects the separate nature of different corporations"); *Medpartners*, 748 N.E.2d at 607-08 ("parent and subsidiary corporations are distinct legal entities"); *Binder*, 184 F. Supp. 2d at 772.

### (2) Estoppel – Petitioners' arguments concerning Reynolds' representations regarding its acquisition and concerning the Brazilian court's Decision

Petitioners also make arguments that fall under an estoppel theory for binding nonsignatories to an arbitration agreement. The Sixth Circuit has instructed that "[a] nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a *direct* benefit from the contract while disavowing the arbitration provision." *Javitch*, 315 F.3d at 629 (emphasis in original). "When only an indirect benefit is sought, however, it is only a signatory that may be estopped from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the underlying contract." *Id.*

a. <u>Equitable estoppel</u>

Petitioners argue that equitable estoppel applies to prevent Reynolds from contradicting its prior statements that (Petitioners argue) confirm that Reynolds merged with UCS. In support of their argument, Petitioners point to past statements by Reynolds in a number of documents: (1) the August 8, 2006 DEFA14A that is an email from Reynolds' then-CEO filed with the SEC (discussed in the Background section, above); (2) the October 26, 2016 8-K that is a press release filed with the SEC (discussed in the Background section, above); (3) statements in two federal district court cases; and (4) Reynolds' website. (Doc. 19 at PAGEID # 356.)

Petitioners' argument fails for at least a couple of independent reasons. First, there is no evidence that Reynolds sought "a direct benefit from the [three contracts at issue], while disavowing the arbitration provision." *Javitch*, 315 F.3d at 629. In fact, Petitioners' filings indicate that the contracts were entered in 1997, court proceedings by the Petitioners against the UCS entities started in the early 2000's, and Reynolds' reverse triangular merger with Racecar did not happen until 2006. (Doc. 1 at PAGEID # 2; Doc. 19 at PAGEID # 359.)

Additionally, besides the more limited application under *Javitch*, the traditional concept of equitable estoppel does not apply here to bind Reynolds. Under the caselaw cited by Petitioners, for equitable estoppel to apply, there must be "1) a factual misrepresentation by defendant, 2) which is misleading, 3) which induces actual reliance that is reasonable and in good faith, and 4) which causes detriment to the relying party." *Gen. Electric Co. v. Advance Stores Co., Inc.*, 285 F. Supp. 2d 1046, 1050 (N.D. Ohio) (applying Ohio law). Additionally, the Ohio Supreme Court has held that "[e]quitable estoppel usually requires actual or constructive fraud." *State ex rel. Shisler v. Ohio Pub. Emps. Ret. Sys,*, 122 Ohio St. 3d 148, 2009-Ohio-2522, 909 N.E.2d 610, 615 (Ohio 2009) (finding equitable estoppel did not apply where there was no evidence of fraud). "[T]he doctrine is applied flexibly depending on the circumstances of a particular case." *Gen.*

*Electric*, 285 F. Supp. 2d at 1050-51.

Although this Court sympathizes with Petitioners' lengthy efforts to resolve its dispute concerning the electronic system (efforts that apparently were ignored by opposing parties for over a decade), the Court finds that equitable estoppel does not apply to bind Reynolds to the arbitration agreements. First, Petitioners cannot show that they relied on any statements other than the two documents filed with the SEC. There is no evidence that Petitioners even knew about the other statements before they filed the Petition, and they could not have relied on statements that they did not know about. (*See, e.g.,* Doc. 19 at PAGEID # 360 ("On the basis of the [August 8, 2006 and October 26, 2006] SEC filings, [Petitioners] requested the Brazilian Court to substitute the name of Reynolds in the order compelling arbitration."); *id.* at PAGEID # 369 (arguing that Petitioners "reasonably relied on Reynolds' SEC filings").)

With respect to the two SEC filings, it is questionable whether Petitioners' reliance on statements indicating that Reynolds merged with UCS was reasonable under the circumstances. The Court agrees with Reynolds that it is curious Petitioners would locate the August 8, 2006 and October 26, 2006 filings with the SEC, but apparently not the Schedule 14A Proxy Statement that was filed with the SEC around the same time and that actually described the structure and type of transaction (*i.e.*, a reversed triangular merger) and parties to the merger. Further, the August 8, 2006 filing is an internal Reynolds company email that was written prior to finalizing how the acquisition of Reynolds would be accomplished, while the October 26, 2006 filing is a press release whose language does not indicate that Reynolds would be succeeding to any liability and seems to raise questions for its readers regarding the form of the actual transaction. (*See* Docs. 19-3 and 19-4.)

Second, Reynolds apparently simplified how it characterized the reverse triangular merger

in the documents that Petitioners highlight. While perhaps misleading, it is a stretch that such statements constitute "a factual misrepresentation," and they are not fraudulent. As in *State ex rel. Shisler*, there is no evidence of fraud or intentional misrepresentation by Reynolds. Based on the circumstances, this Court finds that Reynolds is not bound to the arbitration agreements on an equitable estoppel theory. *Gen. Electric*, 285 F. Supp. 2d at 1050-51; *State ex rel. Shisler*, 909 N.E.2d at 615; *Sanhank*, 404 F.3d at 662.

### b. Judicial estoppel

Petitioners also argue that judicial estoppel applies to prevent Reynolds from contradicting prior statements that it merged with UCS. This argument relates to statements made in two earlier federal district court cases.

As Petitioners point out, the purpose of judicial estoppel "is to protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted). The Supreme Court has explained that judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id.* It is an "equitable doctrine invoked by a court at its discretion." *Id.* at 750. In making the determination, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* (internal quotation marks omitted). "Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity." *Id.* (internal citation and quotation marks omitted).

Reynolds explains in its briefing that "the issue of whether Reynolds merged with an affiliate of UCS was not at stake in either litigation and was of no moment to the result obtained

in either decision" in the two earlier federal district court cases. (Doc. 22 at PAGEID # 659.) In its discretion, applying the guidance from the Supreme Court, this Court finds that judicial estoppel is not applicable here given the circumstances.

c. *Res judicata*

Next, Petitioners argue that, "[e]ven if this Court elects not to treat Reynolds as having formally merged with UCS, or as bound on the basis of the above-[referenced] statutes or estoppel, Reynolds was still bound to arbitrate by the Brazilian court judgment compelling Reynolds to arbitrate in 2015." (Doc. 19 at PAGEID # 369.) As referenced in the Background section above, in accordance with the arbitration provision requiring that a court choose an arbitrator if the parties cannot agree on one, a Brazilian court appointed an arbitrator to hear Petitioners' dispute between the parties (which did not initially include Reynolds). The Brazilian court later issued a "Decision" that substituted Reynolds for five previously-named parties to the arbitration, apparently at Petitioners' request based on the August 8, 2006 and October 26, 2006 SEC filings.

The Court agrees with Reynolds that a party named in foreign court proceedings to which they have no contact and are not subject to jurisdiction can refuse to appear in those proceedings and successfully contest a lack of jurisdiction when faced with subsequent confirmation proceedings. Here, the doctrine of *res judicata* does not apply to bind Reynolds to the Brazilian court's "Decision" or the arbitration agreements.

As an initial matter, the Petitioners assert that "[s]ubstituting Reynolds for UCS [in the arbitration] was proper … because under United States law, the new or resulting company in a merger transaction is automatically responsible for all of the legal obligations of the merged constituent corporations." (Doc. 19 at PAGEID # 360.) However, as shown above, Reynolds did not merge with UCS or DCS, and therefore Reynolds is not liable for their obligations under merger law. Thus, the arbitration and Brazilian court's "Decision" were based on a flawed

understanding of the Reynolds acquisition.

It is also undisputed that the Petitioners never sought recognition and enforcement of the Brazilian court's "Decision" (or any Brazilian court judgment) in the United States. The threshold issue of arbitrability here is decided under United States law. *Sarhank*, 404 F.3d at 661; Inter-American Convention at Art. V(2). "Under American law, whether a party has consented to arbitrate is an issue to be decided by the Court in which enforcement of an award is sought," i.e., this Court. *Sarhank*, 404 F.3d at 661; *see also VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 605 F. App'x 59, 60-61 (2d Cir. 2015) (court was not obligated to enforce or give preclusive effect to Brazilian court's decision on question of arbitrability). As Reynolds states, it declined to appear in any Brazilian proceedings because it was not subject to jurisdiction in Brazil, had never entered into any contract with Petitioners, never agreed to arbitrate any dispute with Petitioners, and was otherwise not a party, successor, or assign of any contract with Petitioners.

Petitioners cite to both federal and Ohio state law in support of their *res judicata* argument. The cited federal caselaw demonstrates the use of a five-factor test for finding that a foreign judgment be given preclusive effect:

> A foreign judgment is recognized, enforced, and given preclusive effect by a court of this country if the court finds five factors to be present. Previously litigated claims should not be retried if the reviewing court finds that [1] the foreign court provided a full and fair trial of the issues in a court of competent jurisdiction, [2] the foreign forum ensured the impartial administration of justice, [3] the foreign forum ensured that the trial was conducted without prejudice or fraud, [4] the foreign court had proper jurisdiction over the parties, and [5] the foreign judgment does not violate public policy.

*AVR Commc'ns, Ltd. v. Am. Hearing Sys.*, 793 F.3d 847, 851-52 (8th Cir. 2015) (internal citations omitted).[11]

---

[11] The facts and circumstances in *AVR Commc'ns* are significantly different from those presented here. The parties

Under Ohio state law, O.R.C. § 2329.91states:

(A) Except as provided in section[] 2329.92 … any foreign country judgment that is final, conclusive, and enforceable where rendered shall be recognized and enforced by the court of this state …

(B) For purposes of division (A) of this section, a foreign country judgment is conclusive between the parties to the extent that it grants or denies the recovery of a sum of money, except that, if any of the following applies, a foreign country judgment is not conclusive: …

> (2) … the foreign court did not have personal jurisdiction over the defendant;

> (3) The foreign court did not have jurisdiction over the subject matter. …

Thus, both federal and state law require that the foreign court had proper jurisdiction over the parties. In support of their argument that Reynolds was subject to jurisdiction in Brazil, Petitioners rely on the doctrine of "jurisdictional merger." (Doc. 19 at PAGEID # 371.) As stated in *In re Telectronics Pacing Sys.*, 953 F. Supp. 909, 919 (S.D. Ohio 1997)—a case cited by Petitioners—the "jurisdiction merger" doctrine is merely a "shorthand device[] for defining what constitutes traditional notions of fair play and substantial justice for purposes of the due process analysis of *International Shoe* based upon the parent-subsidiary relationship." 953 F. Supp. at 919. "The 'minimum contacts test' of *International Shoe* precludes mechanical application of facts and circumstances and requires instead the determination of reasonableness or fairness." *Id.* (internal quotation marks omitted).

Here, the Court finds that Reynolds was not subject to jurisdiction in Brazil. In support of their "jurisdictional merger" argument (as well as their alter ego liability argument, below)

---

in that case <u>did</u> enter into an agreement together that incorporated an arbitration provision. The petitioners commenced an arbitration in a foreign county, and the respondent participated in that arbitration. The respondent objected to inclusion of particular claims in the arbitration (not the arbitration itself), and respondent asked a foreign court to limit the scope of the arbitration. That foreign court—as well as a foreign appeals court—disagreed with respondent. The foreign court subsequently entered judgment on the arbitration award, which respondent appealed in the foreign country. *AVR Communs.*, 793 F.3d at 848-50.

Petitioners point to what they assert are "key facts": "stock ownership, shared personnel, common leadership including Robert Brockman, and most significantly, statements and materials treating Reynolds and UCS as being merged into one company," as well as "the Declaration submitted by Reynolds [to this Court that shows] … Ms. Robinson serves as Vice President for <u>both</u> Reynolds and DCS."  (Doc. 19 at PAGEID # 371-72.)  However, Petitioners do not dispute that Reynolds currently does not do business in Brazil, nor has it ever done business in Brazil.  (Robinson Decl. (Doc. 9-1) at ¶5.)  Petitioners also do not argue that Reynolds has ever had contact with Petitioners or Brazil or is otherwise subject to jurisdiction in Brazil, apart from its allegation that Reynolds merged with UCS (or should be deemed to have done so).  Reynolds is not the parent of the companies that signed the contracts with Petitioners, and this Court finds through its analysis above (and below concerning the alter ego theory of liability) that Reynolds did not merge with UCS or DCS and should not be deemed to have merged.

Although this Court therefore need not address anything further concerning the *res judicata* issue, the Brazilian court's "Decision" also appears unable to fulfill other requirements under federal and Ohio state law necessary to give it preclusive effect:

- under the federal law factors, it is questionable whether Reynolds was "provided a full and fair trial of the issues" with respect to the "Decision";

- under the federal law factors, it is also questionable whether the "Decision" does not violate public policy;

- under Ohio law, it is questionable whether the "Decision" qualifies as a "foreign country judgment" because the definition of "foreign country judgment" is "any judgment of a foreign country that grants or denies the recovery of a sum of money" (O.R.C. § 2329.90(B)), yet the "Decision" does not grant or deny recovery of

money;

- under Ohio law, a foreign country judgment shall not be recognized and enforced if it is determined that "[t]he claim for relief on which the foreign country judgment is based is repugnant to the public policy of" Ohio (O.R.C. § 2329.92(A)(3)); and

- under Ohio law, a foreign country judgment shall not be recognized and enforced where, "[i]f jurisdiction was based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action."

Petitioners cited cases are either not applicable or otherwise distinguishable. For example, *Med. Distribution, Inc. v. Quest Healthcare, Inc.*, No. 3:00cv-154-H, 2002 U.S. Dist. LEXIS 1692 (W.D. Ky. Feb. 1, 2002) did not involve an arbitration or foreign court. It also actually supports Reynolds' position because the court in that case found that it lacked personal jurisdiction over one of the defendants so, therefore, the default judgment against him (and attempts to execute on that judgment) were vacated, despite him having notice of the underlying lawsuit and intentionally declining to respond. *Id.* at *6, 17-18.[12]

Petitioners' *res judicata* argument also contains aspects of a claim that Reynolds waived any attack on enforcement of the Award due to Reynolds' lack of participation in any proceedings in Brazil (whether court or arbitration), despite Reynolds having notice of those proceedings. Petitioners argue that it was "improper" for Reynolds "to do nothing" for years and now avoid the Award. (Doc. 19 at PAGEID # 372.) However, the fact that Reynolds received notice is not dispositive and does not prevent Reynolds from avoiding the Award. *Town & Country Salida*,

---

[12] *Kalia v. Kalia*, 783 N.E.2d 623, 2002-Ohio-7160 (Ohio Ct. App. 2002) involved a divorce judgment, not an arbitration. In *Comprehensive Accounting Corp. v. Rudell*, 760 F.2d 138 (7th Cir. 1985), the parties had signed a contract with an arbitration clause in it; the defendant said that he would not participate in the arbitration because he could not afford it and "can't see that there is anything left to arbitrate"; and the defendant simply (and surprisingly) argued in the district court during proceedings to confirm the award that he did not know about the arbitration clause.

521 F. App'x at 475-76 ("even if [nonsignatory] properly received notice [of the arbitration proceedings], the more important point is that [the nonsignatory] did not consent to arbitration and cannot be bound as a nonsignatory"). *Accord*: *Nat'l Wastewater Sys., Inc. v. McKittrick Precast, Inc.*, No. 2:13-0527, 2013 U.S. Dist. LEXIS 124015, at *7-9 (W.D. La. Aug. 29, 2013) (party had right to challenge award on the basis that no written agreement to arbitrate existed, even when that party failed to appear and had proper notice of the arbitration proceedings); *Allstate Ins. Co. v. Banco Do Estado Do Rio Grande Do Sul, S.A.*, No. 04 Civ. 1550, 2004 U.S. Dist. LEXIS 11397, at *24-25 (S.D.N.Y. June 24, 2004) (plaintiff U.S. corporation "seeks to create an obligation on the part of [defendant Brazilian parent corporation] to compensate [plaintiff] for its subsidiary's debts, … [but plaintiff] has not shown … [that defendant Brazilian parent corporation] is liable for contracts to which it was not a party, or for the payment of an award obtained in arbitration proceedings in which it did not participate").

As the First Circuit Court of Appeals explained, "if the agreement to arbitrate does not exist, there is no obligation to arbitrate – and a noncontracting person's failure to appear at the arbitration hearing does not create such an obligation." *MCI Telecommunications Corp. v. Exalon Indus., Inc.*, 138 F.3d 426, 430 (1st Cir. 1998). "A party that contends that it is not bound by an agreement to arbitrate can therefore simply abstain from participation in the proceedings, and raise the inexistence of a written contractual agreement to arbitrate as a defense to a proceeding seeking confirmation of the arbitration award." *Id*. Although *MCI Telecommunications* was decided in the context of the FAA, its logic applies given the language contained in the Inter-American Convention. Inter-American Convention at Articles I and V(2)(a) (both quoted above).

Therefore, this Court finds that the Brazilian court's "Decision" does not bind Reynolds to the arbitration agreements.

**(3) Alter ego liability – Petitioners' arguments concerning Reynolds' corporate integration**

Finally, Petitioners also argue that they "present[] more than enough evidence in the exhibits to [their] petition and in [their] brief" to establish that Reynolds should be bound by the Award on the basis of an alter ego theory of liability. (Doc. 19 at PAGEID # 372.) As referenced above, the Sixth Circuit has recognized alter ego as another theory for binding nonsignatories to the arbitration agreements of others.[13] *Javitch*, 315 F.3d at 629; *Sarhank*, 404 F.3d at 662.

Under Ohio law, the alter ego doctrine of liability applies where "the corporation is so dominated by the shareholder that it has no separate mind, will, or existence of its own." *Belvedere Condo. Unit Owners' Assoc. v. R.E. Roark Cos., Inc.*, 67 Ohio St. 3d 274, 617 N.E.2d 1075, 1086 (Ohio 1993).[14] In order to establish the doctrine, "a plaintiff must prove that the individual and the corporation are fundamentally indistinguishable." *Pottschmidt v. Klosterman*, 169 Ohio App. 3d 824, 2006-Ohio-6964, 865 N.E.2d 111, 121 (Ohio Ct. App. 2006) (cited by Petitioners). "Some of the factors used to determine if this standard has been met include: (1) whether corporate formalities were observed; (2) whether corporate records were kept; (3) whether corporate funds were commingled with personal funds; and (4) whether corporate property was used for a personal purpose." *Id.*

Petitioners argue that the facts in support of its *res judicata* argument (set forth above)

---

[13] Although Reynolds' briefing focuses on the requirements for piercing the corporate veil, Petitioners do not base their argument on veil piercing, but instead on alter ego liability. As explained in this Order, the two are distinguishable (at least under Ohio law).

[14] The Ohio Supreme Court in *Belvedere* established a three-prong test for piercing the corporate veil, but later modified the second prong in *Dombroski v. WellPoint, Inc.*, 119 Ohio St. 3d 506, 2008-Ohio-4827, 895 N.E.2d 538 (Ohio 2008). That modification is irrelevant here because the alter ego doctrine is the first prong of the test, not the second. *Belvedere*, 617 N.E.2d at 1086. Thus, under Ohio law, the veil piercing doctrine subsumes the alter ego doctrine. *Id. See also Fifth Third Bank v. Diversified Transp. Servs., Inc.*, No. CI 09-2373, 2010 Ohio Misc. LEXIS 547, at *30-32 (explaining that the Sixth Circuit Court of Appeals in *Fisher v. Slone*, 296 F. App'x 494, 506-07 (6th Cir. 2008) was mistaken in its explanation of the distinction between the piercing-the-corporate-veil and alter ego doctrines).

"justify binding Reynolds as an alter ego of UCS." (Doc. 19 at PAGEID # 371-73.) However, the Court disagrees and finds that Reynolds should not be bound on the basis of an alter ego theory of liability. The factors set forth in *Pottschmidt* are not supported by the facts here. *See Pottschmidt*, 865 N.E.2d at 121 (finding alter ego doctrine applied where defendant was the manager and sole shareholder of both entities, neither defendant nor either entity followed corporate formalities, the defendant had complete control over both entities, and funds of each entity and the defendant were commingled). Reynolds and DCS—which, again, merged with UCS in 2001, with DCS as the surviving entity post-merger—are not one and the same, but instead have been shown to exist as separate entities. (Docs. 9-1, 9-2, 9-3, 22-1.) Also, Reynolds does not own UCS (or DCS) or any of the parties that contracted with Petitioners. *Minno v. Pro-Fab, Inc.*, 121 Ohio St. 3d 464, 2009-Ohio-1247, 905 N.E.2d 613, 617 (Ohio 2009) (liability cannot be imposed on a corporation that holds no ownership interest in its sister corporation that allegedly committed the wrongful acts).

## IV.   **CONCLUSION**

For the reasons stated above, the Court **DENIES** the "Petition to Confirm Arbitration Award and to Enter Judgment" (Doc. 1).[15] The Court does not, and need not, address the merits of the claims in the underlying arbitration. Instead, the Court simply finds that Reynolds has met its burden of demonstrating one of the grounds for refusing to recognize and enforce the Award pursuant to Article V(2)(a) of the Inter-American Convention. Reynolds is not a signatory to the arbitration agreements and is not otherwise bound by the arbitration agreements. This case shall be **TERMINATED** on the Court's docket.

---

[15] Due to the analysis and outcome above, the Court does not reach (1) Reynolds' argument that the Award should not be enforced because it would be contrary to public policy per Article V(2)(b) of the Inter-American Convention, or (2) the parties' arguments concerning the amounts, costs, fees, and interests awarded in the Award.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, September 6, 2019.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE